# In the United States Court of Appeals for the Eighth Circuit

---

TODD DEGEER,
*Plaintiff-Appellant,*

v.

UNION PACIFIC RAILROAD CO.,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Western District of Nebraska - Omaha
No. 8:23-cv-00010-RFR (The Hon. Robert F. Rossiter)

---

## BRIEF OF PLAINTIFF-APPELLANT

---

JAMES H. KASTER
LUCAS J. KASTER
NICHOLS KASTER, PLLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 256-3200

MATTHEW W.H. WESSLER
LINNET R. DAVIS-STERMITZ
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

September 21, 2023

*Counsel for Plaintiff-Appellant*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Todd DeGeer respectfully requests an opportunity to present oral argument in this appeal. This case presents an important issue central to Rule 23 class-action practice: When all parties in a putative class action recognize that certain plaintiffs are included in the class, must those plaintiffs nonetheless file their own individual actions to prevent their claim from being time-barred in the event that a certified class is later decertified? *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (explaining that the filing of a class-action complaint "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action" because such a filing supplies a defendant with all the "essential information" it needs to defend itself against those claims); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983) (explaining that a contrary rule would "frustrate[]" the "principal purposes of the class action procedure"). Argument will assist the Court in resolving this important legal issue.

For these reasons, Mr. DeGeer requests 15 minutes of oral argument.

Appellate Case: 23-2625    Page: 2    Date Filed: 09/25/2023 Entry ID: 5319417

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Todd DeGeer makes the following required disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No.**

September 21, 2023                    _/s/ Matthew W.H. Wessler_
                                      Matthew W.H. Wessler

ii

# TABLE OF CONTENTS

Summary of the case and request for oral argument .................................................. i

Corporate disclosure statement ................................................................. ii

Table of authorities ......................................................................... v

Introduction ............................................................................... 1

Jurisdictional statement ..................................................................... 4

Statement of the issue ...................................................................... 4

Statement of the case ....................................................................... 5

    A.    Union Pacific hires Mr. DeGeer over forty years ago and he performs the duties of a railroad conductor for years without incident ................................................................... 5

    B.    Under changes to Union Pacific's fitness-for-duty program, the company decides that Mr. DeGeer had a vision deficiency that precluded him from doing his job ........................................ 6

    C.    The *Harris* class action represents more than 7,000 Union Pacific employees, Mr. DeGeer among them ....................................... 7

    D.    Shortly after the decertification of the *Harris* class, Mr. DeGeer files his own EEOC charge and his own ADA action ........................ 15

Summary of argument ...................................................................... 21

Standard of review ......................................................................... 23

Argument ................................................................................. 24

    I.    Under *American Pipe*, Mr. DeGeer's suit is timely. ............................... 24

        A.    For the last fifty years, *American Pipe* has entitled putative class members to the tolling of the statute of limitations on their claims until and unless the class is decertified ............. 24

        B.    Mr. DeGeer's suit is timely because he was entitled to *American Pipe* tolling as a member of the *Harris* class ................. 28

Appellate Case: 23-2625    Page: 4    Date Filed: 09/25/2023 Entry ID: 5319417

II.     The district court's contrary logic distorts *American Pipe* tolling
        beyond all recognition ........................................................................ 33

Conclusion.............................................................................................................41

iv

# TABLE OF AUTHORITIES

## Cases

*Adams Public School District v. Asbestos Corp.*,
7 F.3d 717 (8th Cir. 1993)................................................................27

*American Pipe & Construction Co. v. Utah*,
414 U.S. 538 (1974).............................................................. *passim*

*Anderson v. Unisys Corp.*,
47 F.3d 302 (8th Cir. 1995)............................................................ 28

*Arch of Kentucky, Inc. v. Director, Office of Workers' Compensation Programs*,
556 F.3d 472 (6th Cir. 2009) ......................................................... 25

*Barryman-Turner v. District of Columbia*,
115 F. Supp. 3d 126 (D.D.C. 2016) ........................................... 34, 38

*Bridges v. Department of Maryland State Police*,
441 F.3d 197 (4th Cir. 2006) ......................................................28, 39

*Burnett v. New York Central Railroad Co.*,
380 U.S. 424 (1965)...................................................................25, 26

*California Public Employees' Retirement System v. ANZ Securities, Inc.*,
582 U.S. 497 (2017) ..................................................................... 25

*China Agritech, Inc. v. Resh*,
138 S. Ct. 1800 (2018) .................................................................. 25

*Crown, Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983) ................................................................ *passim*

*Gerhardson v. Gopher News Co.*,
698 F.3d 1052 (8th Cir. 2012)......................................................... 24

*Harris v. Union Pacific Railroad Co.*,
329 F.R.D. 616 (D. Neb. Feb. 5, 2019) ........................................ *passim*

*Harris v. Union Pacific Railroad Co.*,
953 F.3d 1030 (8th Cir. 2020) .....................................................8, 15

v

*Imperial Point Colonnades Condominium, Inc. v. Mangurian*,
  549 F.2d 1029 (5th Cir. 1977) ................................................ 26

*Levitt v. Merck & Co.*,
  914 F.3d 1169 (8th Cir. 2019) ............................................ 23, 24

*Lloyd's Leasing Ltd. v. Bates*,
  902 F.2d 368 (5th Cir. 1990) ................................................ 40

*Menhorn v. Firestone Tire & Rubber Co.*,
  738 F.2d 1496 (9th Cir. 1984) ............................................... 25

*Odle v. Wal-Mart Stores, Inc.*,
  747 F.3d 315 (5th Cir. 2014) ................................................ 27

*Vaught v. Showa Denko K.K.*,
  107 F.3d 1137 (5th Cir. 1997) ............................................... 33

## Statutes

28 U.S.C. § 1291 .................................................................... 4

28 U.S.C. § 1331 .................................................................... 4

42 U.S.C. § 12101 ................................................................... 4

42 U.S.C. § 12112 ............................................................... 8, 16

49 U.S.C. § 20109 .................................................................. 5

## Regulations

49 C.F.R. § 242.1 ................................................................... 5

vi

# INTRODUCTION

Nearly fifty years ago, the U.S. Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), set out an important bright-line tolling rule. Whenever a class action is filed, the statute of limitations is tolled as to all asserted members of the class—until or unless class certification is denied or the class members receive notice of class certification and decide to opt out. That rule, the Court explained, serves the twin aims of a limitations period, on the one hand, and of Federal Rule of Civil Procedure 23, on the other: It ensures that defendants have notice of the nature and scope of the claims against them, and it spares the litigation system from the repetitious filings of class members attempting to preserve their claims.

That rule should have been applied here. In 2016, a group of Union Pacific employees commenced a class action against the company in a case called *Harris v. Union Pacific Railroad Company*. In that case, the plaintiffs alleged that the railroad discriminated against workers with disabilities in violation of the Americans with Disabilities Act by routing workers suspected of various health conditions into its "fitness-for-duty" program, where it applied restrictive criteria to bar them from jobs they had previously performed without issue. Todd DeGeer was one such worker. He worked for Union Pacific for nearly 40 years, most recently as a conductor, and performed his duties safely and effectively throughout that period. But in 2017, as part of a routine recertification, he failed an exam meant to test his ability to detect

1

multicolored traffic signals. And so Union Pacific subjected him to its new fitness-for-duty procedures: It suspended him from work without pay, imposed further testing and evaluation, and, ultimately, barred him from working for the company.

Throughout the *Harris* litigation, both the parties and the district court consistently recognized that Mr. DeGeer, and other workers like him, were members of the putative class. Union Pacific included him on a list meant to capture the class; the plaintiffs provided declarations from class members, including Mr. DeGeer, to support their motion for class certification; the district court explicitly held that he was a "class member[]" in its decision certifying the class; and, once the class was certified, the court ordered that notice be sent to everyone in the class—including Mr. DeGeer. And when Union Pacific challenged the class certification decision in a previous appeal to this Court, it used the inclusion of workers just like Mr. DeGeer as an illustration of the problems with class treatment.

But after Union Pacific persuaded this Court to decertify the class, the company promptly changed its tune. Having left Mr. DeGeer and those like him with no choice but to pursue their own individual cases, Union Pacific turned around and asserted in each of those cases that it was too late. For the first time, it claimed that these workers had in fact not been members of the *Harris* class when the plaintiffs moved to certify, and thus that their individual claims were now time-barred.

The district court in Mr. DeGeer's individual case agreed. But to reach that conclusion, the court distorted the *American Pipe* tolling rule beyond all recognition. Setting aside what everyone in *Harris* had actually said about who was in the class the plaintiffs sought to certify, the district court here seized on one line in the declaration that Mr. DeGeer filed *as a putative class member*. Then, it used that definition to reverse-engineer a different interpretation of the class definition that it then used to conclude that Mr. DeGeer had not, in fact, been part of the class in *Harris*.

This approach to *American Pipe* tolling is unprecedented, and no authority supports it. For good reason: Left to stand, the district court's decision subverts the purposes of the doctrine altogether, requiring acknowledged class members to file repetitious filings to guard against the risk that some later court, separated in time and space from the class litigation, will misunderstand the class and deem the class members to be excluded from it. And that fear would be well founded because that is exactly what happened here. Nothing in Mr. DeGeer's declaration excluded him from the class. To the contrary, as everyone in *Harris* repeatedly affirmed, he was intended to be a class member—and thus was entitled to tolling until the class was decertified or he opted out. This Court should reverse the district court's error.

Appellate Case: 23-2625    Page: 10    Date Filed: 09/25/2023 Entry ID: 5319417

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the federal Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*; App. 3, R. Doc. 1, at 3. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court granted final judgment to the defendant on all claims. App. 488–89, R. Doc. 51 at 11–12; App. 490, R. Doc. 52.

The district court entered its order granting judgment on the pleadings to Union Pacific on June 21, 2023. App. 489, R. Doc. 51, at 12. Mr. DeGeer timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on July 12, 2023. *See* App. 491, R. Doc. 53.

## STATEMENT OF THE ISSUE

Did the district court err in refusing to apply *American Pipe* tolling and holding instead that Mr. DeGeer's Americans with Disabilities Act claims were time-barred even though he was a member of a previous class action that raised the same claims?

Apposite cases on this issue include *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983), and *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620-23 (D. Neb. 2019), *reversed*, 953 F.3d 1030 (8th Cir. 2020). There are no apposite statutory or constitutional provisions.

## STATEMENT OF THE CASE

### A. Union Pacific hires Mr. DeGeer over forty years ago and he performs the duties of a railroad conductor for years without incident.

Union Pacific first hired Todd DeGeer over 40 years ago, in October 1978. App. 5, R. Doc. 1, at 5; App. 52–53, R. Doc. 16, at 2–3, App. 337, R. Doc. 29, at 1. For much of that time, he worked as a railroad conductor. App. 5, R. Doc. 1, at 5; App. 53, R. Doc. 16, at 3; App. 337, R. Doc. 29, at 1; App. 440, R. Doc. 45, at 1. One of the tasks of that role is reading multicolored railroad traffic signals. App. 5, R. Doc. 1, at 5. As a result, the job requires a degree of color-vision acuity—not perfect color vision, but, as the Federal Railroad Administration has recognized, color vision sufficient to recognize and distinguish colored signals. App. 1–2, R. Doc. 1, at 1–2. The Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109, and accompanying regulations require periodic certifications that conductors possess these abilities. *See* 49 C.F.R. § 242.1; App. 1–2, R. Doc. 1, at 1–2. That certification starts with an FRA-approved color-vision-acuity examination—such as the Ishihara test, which requires takers to examine a series of colored disks to identify what numbers or figures they depict. App. 1–2, R. Doc. 1, at 1–2. If an employee fails that examination, the FRSA's

5

regulations provide for "further medical evaluation," such as through another approved "scientific test" or a "field test." App. 443, R. Doc. 45, at 4.[1]

For the vast majority of Mr. DeGeer's long tenure with the company, that is what Union Pacific did. Around 2014, for instance, Mr. DeGeer took and failed an Ishihara test, but was offered and passed a follow-up field test meant to match his everyday working conditions. *See* App. 5–6, R. Doc. 1, 5–6, App. 53, R. Doc. 16, at 3; App. 337, R. Doc. 29, at 1. Throughout his time with the company, Mr. DeGeer performed his job safely, diligently, and consistently—not once misreading a traffic signal. App. 5, R. Doc. 1, at 5; App. 53, R. Doc. 16, at 3, App. 337, R. Doc. 29, at 1.[2]

## B. Under changes to Union Pacific's fitness-for-duty program, the company decides that Mr. DeGeer had a vision deficiency that precluded him from doing his job.

But then Union Pacific changed its approach. Beginning in 2014, the company made dramatic changes to its internal "Fitness-for-Duty" program, deciding that employees suspected of having certain medical or physical conditions should be suspended from work without pay, required to undergo further evaluation, and,

---

[1] Unless otherwise noted, all quotations in this brief omit internal brackets, emphases, ellipses, and citations.

[2] Before his employment with Union Pacific, Mr. DeGeer was aware that he had a color-vision deficiency. App. 53, R. Doc. 16, at 3; App. 337, R. Doc. 29, at 1. But his color vision has never affected his ability to perform tasks other than passing the Ishihara test. *Id.*

Appellate Case: 23-2625     Page: 13     Date Filed: 09/25/2023 Entry ID: 5319417

frequently, restricted altogether from work with the company. App. 4–5, R. Doc. 1, 4–5, App. 74, R. Doc. 17-1, at 2.

So when, in 2017, Mr. DeGeer failed an Ishihara test, the company didn't offer him the field test it had used previously. Instead, his result "triggered" a fitness-for-duty evaluation. App. 4, 6, R. Doc. 1, 4, 6. Under that program, he was suspended from his conductor position. App. 3–4, 6, R. Doc. 1, 3–4, 6; App. 53–54, R. Doc. 16, at 3–4. In lieu of its prior field test, Union Pacific required him to take a new, proprietary "Light Cannon" test the company had developed in-house—even though that test wasn't modeled on real-world conditions and flunked the FRSA regulations' minimum validation standards. App. 5–6, R. Doc. 1, at 5–6; App. 53, R. Doc. 16, at 3; App. 338, R. Doc. 29, at 2; App. 443, 445–46, R. Doc. 45, at 4, 6–7. And when Mr. DeGeer failed that proprietary test, Union Pacific decided that he had a color-vision deficiency that prevented him from doing his job. App. 6, R. Doc. 1, at 6; App. 53–54, R. Doc. 16, at 3–4. As a result, in June 2017, Union Pacific removed Mr. DeGeer from his job and imposed permanent work restrictions that barred him from working in any position requiring the identification of traffic signals. App. 6, R. Doc. 1, at 6; App. 53–54, R. Doc. 16, at 3–4; App. 338, R. Doc. 29, at 2.

## C. The *Harris* class action represents more than 7,000 Union Pacific employees, Mr. DeGeer among them.

**1.** Unfortunately, Mr. DeGeer's experience was not unique. Since 2014, thousands of Union Pacific employees have, on account of the company's misgivings

7

about their health, been automatically excluded from their jobs, evaluated under strict fitness-for-duty criteria, and, often, barred from their positions altogether. App. 2–3, R. Doc. 2–3; App. 51, R. Doc. 16, at 1; App. 337, R. Doc. 29, at 1. In 2016, several employees made these practices the subject of a class-action lawsuit against Union Pacific, bringing disparate-treatment and disparate-impact claims under the Americans with Disabilities Act. *Harris v. Union Pacific Railroad Company*, No. 8:16-cv-381 (D. Neb.). They argued that the company discriminated against employees with disabilities and perceived disabilities in violation of the Americans with Disabilities Act in a variety of ways, including because its fitness-for-duty policies screened individuals with disabilities out of its workforce "even though [] they had no trouble fulfilling the essential functions of their jobs." *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620–23 (D. Neb. 2019), *reversed*, 953 F.3d 1030 (8th Cir. 2020); *see* 42 U.S.C. §§ 12112(a), (b)(6).

The *Harris* plaintiffs centered their claims on the changes Union Pacific made to its fitness-for-duty program beginning in 2014. At that time, Union Pacific decided that workers with a wide range of medical conditions posed an "unacceptable" safety risk to the company and tasked a small cadre of doctors and nurses with implementing standardized, automatic policies to screen those workers out of many of the company's roles. App. 123, R. Doc. 17-2, at 6; *Harris*, 329 F.R.D. at 620 n.2, 623. To identify whom to target, the company required workers to disclose any

8

"Reportable Health Event[]"—"any new diagnosis, recent event[], and/or change" in a specified list of conditions, ranging from Type I Diabetes to severe sleep apnea to vision ability. App. 76, R. Doc. 17-1, at 4. But disclosure wasn't the only way employees could be routed into the fitness-for-duty program. As Union Pacific's Director of Clinical Services put it, a reportable health event that "trigger[s]" the company's fitness-for-duty evaluation could also be "discover[ed]" "during [a] required regulatory examination . . . such as an FRA examination." App. 121, R. Doc. 17-2, at 4; *see also Harris*, 329 F.R.D. at 620. Nor was such a "reportable" event required to be "new" in the sense that Union Pacific didn't know about it previously. *See e.g.*, App. 80–81, R. Doc. 17-1, at 8–9 (shifting treatment of a longstanding epilepsy diagnosis).

If a worker disclosed such an event or condition (or if Union Pacific learned about one on its own), they were routed into the fitness-for-duty program. App. 1, R. Doc. 1, at 1; App. 74, R. Doc. 17-1, at 2. That meant they were suspended from work and underwent a fitness-for-duty evaluation, during which the company's medical team collected information about the worker and made a final judgment about whether they would be permitted to perform their role. App. 79, R. Doc. 17-1, at 7. The result, the *Harris* plaintiffs alleged, was that a large group of Union Pacific employees who were "qualified and performing their jobs with no problems" were

9

nonetheless "pulled from their jobs" and left with no recourse. *Harris*, 329 F.R.D. at 620.

**2.** At the outset of the *Harris* litigation, the plaintiffs asserted ADA claims on behalf of a class defined as follows:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

App. 89, R. Doc. 17-1, at 17.

But as discovery got underway, Union Pacific complained that the proposed class definition was overbroad. *See* App. 54–55, R. Doc. 16, at 4–5; App. 173, R. Doc. 17-9, at 4; App. 193, R. Doc. 17-13, at 14–15. In particular, the company claimed that the class would be unwieldy and overinclusive—potentially reaching hundreds of thousands of employees—if it required only a fitness-for-duty evaluation, without being in some way tied back to the company's concept of a "Reportable Health Event." *See* App. 54–55, 57–58, R. Doc. 16, at 4–5, 7–8; Ex. 14 at 2. That was inconsistent with the way that Union Pacific "understood" the plaintiffs' claims— which, it said, "revolve[d] around fitness-for-duty evaluations that were initiated because of a Reportable Health Event." App. 57–58, R. Doc. 16 at 7–8; *see also* App. 199, R. Doc. 17-14, at 3. As a result, Union Pacific suggested that the class should encompass only those workers who "were subject to a Fitness for Duty Evaluation

related to" such a "Reportable Health Event." App. 55–56, R. Doc. 16 at 5–6; App. 173, R. Doc. 17-9, at 4; App. 193–94, R. Doc. 17-13, at 14–15.

The case proceeded on this understanding. When asked to "identify all employees" who would "fall within" the "putative class[]," Union Pacific noted that it would do so based on its understanding of who the class included. App. 55–56, R. Doc. 16, at 5–6; App. 193–94, R. Doc. 17-13, at 14–15. Accordingly, Union Pacific produced a series of spreadsheets listing current or former Union Pacific employees, with each new spreadsheet adding additional names. App. 55–56, R. Doc. 16, at 5–6. On July 7, 2017, Union Pacific produced a list including Mr. DeGeer. App. 55–56, R. Doc. 16, at 5–6; App. 173, R. Doc. 17-9, at 4; App. 176, R. Doc. 17-10, at 83. Union Pacific described that list as "identifying 6,290 current or former Union Pacific employees who were subject to a Fitness for Duty Evaluation related to a Reportable Health Event." App. 191, R. Doc. 17-13, at 12. And on February 26, 2018, Union Pacific applied its understanding of a "Reportable Health Event" restriction to produce an expanded spreadsheet of 7,723 current or former Union Pacific employees. App. 56, R. Doc. 16, at 6; App. 177, R. Doc. 17-12.[3] This list, too, included Mr. DeGeer. App. 178, R. Doc. 17-12, at 29.

---

[3] At one point, Union Pacific stated that it produced this list of 7,723 employees on "February 26, 2017," *see* App. 193–95, R. Doc. 17-13, at 14–16. But that appears to be a typo: Elsewhere in the same document, the company recognized that the list was produced on "February 26, 2018." *See* App. 194, R. Doc. 17-13, at 15.

When, not long thereafter, the plaintiffs moved to certify a class, they made crystal-clear that the class they had in mind included each of the "more than 7,000" Union Pacific employees the company had identified. App. 139, R. Doc. 17-2, at 22; *see also* App. 58–59, R. Doc. 16, at 8–9. Incorporating language like what Union Pacific had suggested, the plaintiffs defined the class as "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event." App. 139, R. Doc. 17-2, at 22; App. 58, R. Doc. 16, at 8. That definition, the plaintiffs explained, was intended to "match" "the list of over 7,000 individuals that [Union Pacific] identified in discovery" because "[t]he company represented on multiple occasions that these were the individuals who had been 'subject to a Fitness for Duty Evaluation related to a Reportable Health Event' and that this was the list of class members." App. 205, 207, R. Doc. 17-15, at 2, 4; *see also* App. 59–60, R. Doc. 16, at 9–10.[4] On behalf of this class, the plaintiffs pursued a "disparate treatment" claim—that Union Pacific's fitness-for-duty program discriminated against people with disabilities in violation of sections 12112(a) and (b)(6) of the ADA, both by discriminating in the terms and conditions of employment and by employing facially

---

[4] Although the proposed class definition used the term "as a result of" rather than "related to," Union Pacific had treated those terms as equivalent when it urged the plaintiffs to narrow the class definition. *See, e.g.*, App. 199–201, R. Doc. 17-14, at 2–4 (using the two terms interchangeably).

Appellate Case: 23-2625    Page: 19    Date Filed: 09/25/2023 Entry ID: 5319417

discriminatory standards and criteria that screened them out of the workforce. *See* App. 94, R. Doc. 17-1, at 22; R. Doc. 241, at 22.

Within this proposed class were a range of workers with different conditions, all of whom were subjected to Union Pacific's fitness-for-duty program for having what the company viewed as reportable health events or conditions, and all of whom were ultimately suspended from their jobs. That included workers who, like named plaintiff Harris, had long been diagnosed with conditions like epilepsy. *See* App. 80–81, R. Doc. 17-1, at 8–9. It included workers who, like named plaintiff Baker, suddenly began to experience isolated bouts of lightheadedness. *See* App. 81–82, R. Doc. 17-1, at 9–10. And it included workers who, like Mr. DeGeer, were suspected of a color-vision deficiency because they failed an Ishihara test during a routine FRSA recertification. Many such workers, after all, appeared on Union Pacific's class list—Mr. DeGeer among them. *See* App. 178, R. Doc. 17-12, at 29. And many such workers signed sworn declarations in support of the motion for class certification—again including Mr. DeGeer. App. 60, R. Doc. 16, at 10; App. 161–62, R. Doc. 17-3, at 45–46; *see also, e.g.*, App. 158–59, R. Doc. 17-3, at 6–7 (Leonard Barkmeier); App. 163–64, R. Doc. 17-3, at 50–51 (Justin Donahue); App. 166–67, R. Doc. 17-3, at 86–87 (Kent Kirk).

**3.** On February 5, 2019, the district court certified the *Harris* plaintiffs' proposed class. *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 628 (D. Neb. 2019).

13

Adopting the class definition put forth by the plaintiffs, the district court noted that the plaintiffs' motion was supported by declarations "from 44" such "class members," referencing the batch that included Mr. DeGeer and several similarly-situated plaintiffs, and identifying Mr. DeGeer himself by name. 329 F.R.D. at 624 & n.3. It then acknowledged that each of these declarants had "experienced the discrimination alleged" by the now certified class. *Id.* And lest there be any doubt about who the court had in mind, it "approve[d]" the sending of "notice to the" "class list" "given to plaintiffs by Union Pacific . . . identif[ying] a total of 7,723 current and former employees"—again, including among them Mr. DeGeer. *Id.* at 627–28; *see also* App. 61–62, R. Doc. 16, at 11–12.

That certification order was, however, short-lived. Union Pacific appealed the district court's decision to this Court, complaining that the certified class totaled "more than 7,000" workers who had experienced a "broad[] universe of conditions or events"—ranging from those who "suffered a stroke" to others that "experienced vision deficiencies." App. 282–85, 306–07, R. Doc. 17-20, at 1–4, 25–26; App. 246, R. Doc. 17-19, at 1; *see also* App. 62, R. Doc. 16, at 12. Union Pacific argued that the case posed many individualized questions—not simply on behalf of the class representatives, but also on behalf of each of the "7,000-plus absent class members." App. 306–07, R. Doc. 17-20, at 25–26. The need to prove the existence and impact of each different class member's disability, for instance, was "illustrated" by the

"personal stories" of the 44 declarants, including those whom the company's Ishihara test tagged with vision deficiencies. *Id.* (citing Mr. Barkmeier's declaration); App. 158–59, R. Doc. 17-3, at 6–7. And that was only one difference among "each of the 7,000-plus class absent members": They would also need to prove that they were qualified for a wide range of different jobs, like that of a conductor. App. 261, R. Doc. 17-19, at 16; App. 306–08, R. Doc. 17-20, at 25–27. On this point, Union Pacific again cited as an example someone that it had deemed to have a vision deficiency because he had failed a regularly scheduled recertification vision exam. *See* App. 261, R. Doc. 17-19, at 16 (citing Mr. Donahue's declaration); App. 163–64, R. Doc. 17-3, at 50–51.

On March 24, 2020, this Court agreed with Union Pacific: It granted the company's request and decertified the class. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020).

### D. Shortly after the decertification of the *Harris* class, Mr. DeGeer files his own EEOC charge and his own ADA action.

Following that decertification order, Mr. DeGeer pursued individual relief. On May 1, 2020, 38 days after this Court's decision, he filed an individual discrimination charge with the EEOC. App. 483, R. Doc. 51, at 6. The EEOC completed its review on January 5, 2023, and Mr. DeGeer filed this action just one day later. App. 7, 15, R. Doc. 1, at 7, 15.

In his individual action, Mr. DeGeer alleged on his own two of the same discrimination claims the *Harris* class had pursued on his behalf. As in *Harris*, Mr.

15

DeGeer explained that the reason he was removed stemmed from one of Union Pacific's fitness-for-duty policies—here, its practice of treating suspected color-vision deficiency as triggering a fitness-for-duty evaluation, and its practice of using that evaluation to summarily exclude otherwise qualified employees from service. App. 3, 5–6, R. Doc. 1, 3, 5–6. That policy, Mr. DeGeer alleged, discriminated against him in violation of the ADA because it removed him from service "on the basis of disability" and because it involved "qualification standards, employment tests, or other selection criteria that screen[ed]" him, as "an individual with a disability," out of employment with the company. App. 12–14, R. Doc. 1, at 12–14.

As a result, Mr. DeGeer brought two claims modeled on the first claim brought in *Harris*: a standard disparate-treatment claim under 42 U.S.C. § 12112(a) and a qualification standard claim under 42 U.S.C. § (b)(6)). App. 12–14, R. Doc. 1, at 12–14; *see also* App. 93–94, R. Doc. 17-1, at 21–22 (addressing both claims under Count I). Mr. DeGeer also sought a declaratory judgment that he had been a member of the *Harris* class. App. 14, R. Doc. 1, at 14. And Mr. DeGeer noted that his claims were related to the *Harris* litigation and should be assigned accordingly. But, to prevent the *Harris* district judge from considering his claims, Union Pacific filed a motion for reassignment. *See* R. Doc. 7. A different judge considered and granted the motion, *see* R. Doc. 18, and the case was randomly reassigned, R. Doc. 19.

Appellate Case: 23-2625     Page: 23     Date Filed: 09/25/2023 Entry ID: 5319417

At first, Union Pacific responded to Mr. DeGeer's complaint with an answer, raising, among other things, the defense that Mr. DeGeer's claims were barred by the statute of limitations. App. 23, R. Doc. 8, at 8.[5] Mr. DeGeer then moved for partial summary judgment on that defense, explaining that his claims were timely because he had been a member of the *Harris* class. App. 27, R. Doc 15. Under the U.S. Supreme Court's decision in *American Pipe*, he explained, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class." App. 30, R. Doc. 15, at 4 (quoting *Am. Pipe*, 414 U.S. at 554). That approach makes sense because the filing of the class action serves the same purpose that the filing of an individual action would: It provides a defendant with notice of the substantive claims being brought against it, thereby assuring that the defendant is aware of those claims, and who may assert them, before "evidence has been lost, memories have faded, and witnesses have disappeared." App. 44, R. Doc. 15, at 18 (quoting *Am. Pipe*, 414 U.S. at 554). Any rule to the contrary would require plaintiffs to file vast numbers of redundant, independent suits—and thus be inconsistent with the efficiencies Rule 23 was supposed to secure. App. 43–44, R. Doc. 15, at 17–18.

---

[5] In its briefing below, Union Pacific incorrectly framed Mr. DeGeer's § 12112(b)(6) unlawful screening claim as a disparate impact claim. *See, e.g.*, R. Doc. 22. But the company was confused: Mr. DeGeer's claim is that Union Pacific violated the ADA's bar on disparate *treatment* by employing a facially discriminatory qualification standard. *See* App. 13, R. Doc. 1, at 13; R. Doc. 46 at 32–36.

That logic, Mr. DeGeer explained, applied with its typical force here. Mr. DeGeer was a member of the proposed *Harris* class when that case was first filed, as it was litigated, and up until the point at which this Court decided that the class should be decertified. App. 30–46, R. Doc. 15, at 4–20. Union Pacific thus was on notice that it might face his claims, and the values of Rule 23 were safeguarded by suspending any requirement that he file his own protective suit while the class action was pending. *See id.*

In response, Union Pacific both opposed Mr. DeGeer's partial summary-judgment motion and filed a motion of its own. App. 337, R. Doc. 29; App. 378, R. Doc. 33. Despite styling that motion a "motion for judgment on the pleadings," *see* App. 378, R. Doc. 33, the company submitted a detailed list of "facts" it asked the court to consider in deciding its motion, and stated that it was "affirmatively mov[ing] for summary judgment" on the statute-of-limitations issue, App. 380, R. Doc. 24; App. 392, R. Doc. 35, at 22.

Across its briefing, Union Pacific recognized that the filing of the *Harris* action *initially* tolled the claims of putative class members under the *American Pipe* tolling doctrine. *See* App. 361, R. Doc. 32, at 4. But the company argued that that tolling "ceased" for Mr. DeGeer when the *Harris* plaintiffs moved for class certification. App. 360, R. Doc. 32, at 3.

18

That was so, Union Pacific said, because of the definition of the class the *Harris* plaintiffs sought to certify. According to the company, that definition excluded people like Mr. DeGeer. Even though the company had identified Mr. DeGeer as a member of the very class the *Harris* plaintiffs ultimately proposed, App. 176, R. Doc. 17-10, at 83; App. 178, R. Doc. 17-12 at 29, even though Mr. DeGeer had submitted a declaration in support of that class-certification motion, App. 60, R. Doc. 16, at 10; App. 161–62, R. Doc. 17-3, at 45–46, and even though Union Pacific's own filings with this Court in *Harris* repeatedly treated workers like Mr. DeGeer as class members, *see* App. 306–08, R. Doc. 17-20, at 25–27; App. 261, R. Doc. 17-19, at 16, the company now argued that he nonetheless didn't count, App. 364, R. Doc. 32, at 7; App. 412, R. Doc. 25, at 22. The company arrived at that view by offering its own construction of the proposed class definition. According to Union Pacific, that definition excluded Mr. DeGeer because he didn't experience a "reportable health event" as the company defined the term. App. 360–61, R. Doc. 32, at 3–4. Even though its own Ishihara test had flagged him for a possible color vision issue, Union Pacific insisted that he experienced neither a "new diagnosis" nor any other "recent event," but rather had been subjected to screening and removed from his position for different reasons not captured by the class definition. *Id.*

In response, Mr. DeGeer explained that that view of *American Pipe* tolling erred twice over: It misapplied the class definition, which everyone in *Harris* understood as

19

including Mr. DeGeer; and it misunderstood *American Pipe* tolling, which doesn't turn on flyspecking the definition of a proposed class. App. 423–37, R. Doc. 39, at 4–18.

The district court nevertheless accepted Union Pacific's tolling theory. Although it acknowledged that the case was a "close call," the court decided that Union Pacific had the "stronger position." App. 487–88, R. Doc. 51, at 10–11. To reach that conclusion, the court zeroed in on the declaration Mr. DeGeer had submitted in support of the *Harris* class-certification motion. *See id.* That declaration, the court said, placed Mr. DeGeer outside the class definition because it admitted that he had faced a fitness-for-duty evaluation as part of a routine FRA recertification. *Id.* The court did not explain why that fact prevented that fitness-for-duty evaluation from occurring "as a result of a reportable health event"—if, for instance, a reportable health event was uncovered in the course of the recertification process. Nor did the court explain why Mr. DeGeer would have submitted such a declaration, and been treated by everyone in *Harris* as a putative class member, if in fact he was not a class member at all. Instead, the court insisted that Mr. DeGeer should have figured out that the FRA recertification wrinkle meant he was excluded from the class and filed an individual EEOC charge, rather than believing that the class action continued to preserve his rights. *Id.* As a result, the court denied Mr. DeGeer's motion for partial

summary judgment and granted Union Pacific's motion for judgment on the pleadings.[6]

## SUMMARY OF ARGUMENT

**I.A.** Under *American Pipe*, the filing of a class action suspends the applicable statute of limitations "as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. That is for two reasons. *First*, the filing of a class action satisfies the notice and fairness objectives of limitations periods as to all the members of the asserted class, equipping a defendant with all the "essential information" it needs to defend itself against the claims of the class and any of its members. *Id.* at 555. And *second*, a contrary rule would frustrate the objectives of Rule 23 by encouraging class members to file repetitious papers and motions to preserve their claims. *Id.* at 551.

**I.B.1.** *American Pipe* applies straightforwardly here. When the *Harris* class action was commenced, the proposed class included everyone who, like Mr. DeGeer, was removed from service for reasons related to a fitness-for-duty evaluation.

**2.** That did not change over the course of the litigation. When Union Pacific urged the plaintiffs to narrow the scope of the proposed class, it produced a corresponding class list that included Mr. DeGeer and others like him. When the

---

[6] The court did not acknowledge or grapple with Union Pacific's assertion that as to these grounds, it was in fact seeking summary judgment, not judgment on the pleadings.

Appellate Case: 23-2625     Page: 28     Date Filed: 09/25/2023 Entry ID: 5319417

plaintiffs moved for class certification, they made clear that was the class they had in mind. When the district court certified the class, it did the same—and went so far as to name Mr. DeGeer as one of its members. And when Union Pacific appealed the class-certification order, it, too, treated workers like Mr. DeGeer as class members, complaining that their inclusion in the class was one reason it should be decertified.

**3.** Mr. DeGeer thus was entitled to *American Pipe* tolling until the Eighth Circuit decertified the class. Because he timely filed his EEOC complaint shortly after the Eighth Circuit ruled, and then filed this federal suit immediately after the EEOC's determination, his claim was timely as well.

**II.** The district court reached the contrary conclusion by ignoring what happened in the *Harris* litigation and instead attempting to decide, based solely on its own effort to reverse-engineer the contours of the class definition, who it encompassed and who it excluded. It reached the wrong result with the wrong approach.

**A.** *First*, the district court misapplied the class definition. It believed that the class excluded Mr. DeGeer for one reason only: His declaration in support of the *Harris* plaintiffs' class-certification motion purportedly admitted that his fitness-for-duty evaluation occurred as part of his routine FRA recertification. In the court's view, that meant he fell outside the definition the *Harris* plaintiffs sought to certify. But the declaration said nothing of the sort. And everyone in *Harris*—the court, the

plaintiffs, and the defendant—understood that workers in Mr. DeGeer's circumstances were class members. They didn't understand an FRA recertification and a reportable health event as somehow incompatible. That's why Mr. DeGeer filed a declaration in support of class certification in the first place.

**B.** *Second*, to the extent the district court believed that it was entitled to piece apart the class definition of its own accord, it was wrong. The district court that actually presided over the *Harris* litigation explicitly held that Mr. DeGeer was a class member, and there was no justification for the district court in this case to deviate from that decision.

**C.** *Third*, the district court's approach abandons the equities that *American Pipe* tolling guarantees. Under that approach, putative class members would be required to monitor class proceedings, track and parse changes in a class definition, and affirmatively disregard statements of the parties and the district court indicating that they are and remain class members. But *American Pipe* explicitly divested class members of any duty to monitor a class suit. Imposing that duty on them anyway would invite the very multiplicity of filings that the doctrine is meant to avoid.

## STANDARD OF REVIEW

This Court reviews a district court's grant of judgment on the pleadings de novo. *Levitt v. Merck & Co.*, 914 F.3d 1169, 1171 (8th Cir. 2019). The movant bears "the burden of clearly establishing that there are no material issues of fact and that it is

entitled to judgment as a matter of law." *Id.* "At this stage," this Court "view[s] all facts pleaded by [the nonmovant] as true and grant[s them] all reasonable inferences." *Id.*

To the extent the district court's decision is best viewed as a grant of summary judgment, *see* App. 392, R. Doc. 35, at 22, this court "review[s] de novo" a "grant of summary judgment on statute of limitations grounds, construing all evidence in the light most favorable to the nonmoving party." *Gerhardson v. Gopher News Co.*, 698 F.3d 1052, 1055 (8th Cir. 2012). This court "will affirm the district court only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

## ARGUMENT

### I. Under *American Pipe*, Mr. DeGeer's suit is timely.

#### A. For the last fifty years, *American Pipe* has entitled putative class members to the tolling of the statute of limitations on their claims until and unless the class is decertified.

In *American Pipe & Construction Co. v. Utah*, the U.S. Supreme Court set out a straightforward rule: "The commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. For half a century, that rule has meant that, for every putative class member, the limitations period remains tolled until and unless "class certification is denied"—at

which point "class members may" either "chose to file their own suits," or decide "to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983). The Court has repeatedly reaffirmed these basic principles. *See, e.g.*, *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1806-07 (2018); *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 509 (2017).

The reasons for that rule, *American Pipe* explained, are common sense. Statutes of limitations serve an important objective. They prevent plaintiffs from sitting on their rights, barring "the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Am. Pipe*, 414 U.S. at 554. In doing so, they "assure fairness to defendants," *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965), and ensure that defendants are "on notice" of the claims they might face, *Crown, Cork*, 462 U.S. at 352. At the same time, "considerations of fair notice to plaintiffs" support "protecting unwary litigants against the inadvertent loss" of their claims "through the running of the statute of limitations." *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 n.3 (9th Cir. 1984). A statute of limitations, in other words, is not designed "as a trap for the unwary or unsophisticated." *Arch of Ky., Inc. v. Dir., Off. of Workers' Comp. Programs*, 556 F.3d 472, 482 (6th Cir. 2009).

Where an *individual* suit is concerned, these considerations generally mean that each claim must be filed within a set period of time from the offending conduct—

unless "the interests of justice," such as a defendant's own role in delaying or concealing a claim, "outweigh[]" the general "policy of repose." *Burnett*, 380 U.S. at 428.

But when it comes to a class action, different logic kicks in. Once a class-action complaint has been filed, the "purpose of [a] limitation provision" has been satisfied not simply as to "the named plaintiffs," but also as to "*all* those who might subsequently participate in the suit." *Am. Pipe*, 414 U.S. at 551 (emphasis added). That is because, by filing the class-action complaint, the named plaintiff has taken care of the defendant's notice and fairness concerns, informing it "not only of the substantive claims being brought against [it], but also of the number and generic identities of the potential plaintiffs who may participate." *Id.* at 555.

This means that the defendant possesses the "essential information" to defend itself against each of the proposed claims—from the "subject matter" of "the prospective litigation" to its expected size and scope—before those claims become stale. *Id.* The defendant will, as a result, be well "aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class." *Crown, Cork*, 462 U.S. at 353. And the defendant won't be surprised when—should a class action prove untenable—it faces the class members' individual claims. *See id.*; *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1041 (5th Cir. 1977) (recognizing that, in this context, defendants "hardly are in a position to argue for the protection

26

of the statute of limitations on the traditional ground that 'evidence has been lost, memories have faded, and witnesses have disappeared[.]'" (quoting *Am. Pipe*, 414 U.S. at 544)); *see also, e.g.*, *Adams Pub. Sch. Dist. v. Asbestos Corp.*, 7 F.3d 717, 718–19 (8th Cir. 1993) (explaining why the *American Pipe* rule is "consistent with the purpose of statutes of limitation").

Nor could putative class members "be accused of sleeping on their rights" if they declined to file their own protective intervention motions or competing suits. *Crown, Cork*, 462 U.S. at 352. Indeed, requiring them to take those steps would "frustrate" the "principal function" of a class suit altogether by encouraging the "unnecessary filing of repetitious papers and motions"—the very "multiplicity of activity which Rule 23 was designed to avoid." *Am. Pipe*, 414 U.S. at 550–51; *see Odle v. Wal-Mart Stores, Inc.*, 747 F.3d 315, 320 (5th Cir. 2014) ("[T]he class action mechanism would not succeed in its goal of reducing repetitious and unnecessary filings if members of a putative class were required to file individual suits to prevent their claims from expiring if certification of the class is denied."). That is why Rule 23 "both permits and encourages class members to rely on the named plaintiffs to press their claims." *Crown, Cork*, 462 U.S. at 352-53. And so, *American Pipe* held, class members are entitled to be thought of as "parties to the suit" for limitations purposes "until and unless they receive[] notice thereof and cho[ose] not to continue." 414 U.S. at 551.

Appellate Case: 23-2625     Page: 34     Date Filed: 09/25/2023 Entry ID: 5319417

The *American Pipe* tolling rule is both broad and concrete. *See Bridges v. Dep't of Md. State Police*, 441 F.3d 197, 212 (4th Cir. 2006) (explaining that the Supreme Court in *American Pipe* was "highly sensitive to the need for certainty of a bright-line rule"). It applies whether or not putative class members are aware of the underlying class proceedings. *See Am. Pipe*, 414 U.S. at 553. It applies whether, following decertification, class members seek to intervene in the initial class action, or whether they instead opt to file their own individual suits. *Crown, Cork*, 462 U.S. at 350. And it applies irrespective of "the substantive reason" for the denial of class certification—because any contrary approach would end up encouraging the very premature intervention that the rule was designed to avoid. *Bridges*, 441 F.3d at 211. Instead, the rule simply "tolls the limitations period on viable claims while the trial court determines the parameters of the class in any possible class action." *Anderson v. Unisys Corp.*, 47 F.3d 302, 308 (8th Cir. 1995).

## B.  Mr. DeGeer's suit is timely because he was entitled to *American Pipe* tolling as a member of the *Harris* class.

*American Pipe*'s tolling rule applies here. As explained below, when Mr. DeGeer was subjected to a fitness-for-duty evaluation for a suspected vision deficiency, he became a putative member of the proposed class. Throughout the life of the class action, that never changed. And once the class was decertified and the limitations period began to run again, Mr. DeGeer was well within the allotted time when he filed an EEOC charge, and then a federal complaint, raising the same claims that

28

were the basis for the *Harris* class. He was therefore entitled to *American Pipe* tolling on those claims.

**1.** When the *Harris* class action was filed, the proposed class included every Union Pacific employee who was removed from service after being subject to a fitness-for-duty exam because they had failed an Ishihara exam during a routine recertification. *See* App. 89, R. Doc. 17-1, at 17 (describing the class as "[i]ndividuals who were removed from service over their objection, and/or suffered another adverse employment action . . . for reasons related to a Fitness-for-Duty evaluation"). That included Mr. DeGeer—once he too was required to undergo a fitness-for-duty evaluation after failing the Ishihara exam. Mr. DeGeer was a Union Pacific employee who "suffered [an] adverse employment action," as the class definition required, *id.* He was removed from his position and faced onerous work restrictions that prevented him from working for the company, App. 3, 5–6, R. Doc. 1, at 3, 5–6. And he suffered those consequences for "reasons related to a Fitness-for-Duty evaluation": His failure of the Ishihara vision test "triggered" a fitness-for-duty evaluation that led to his being removed from work, subjected to a proprietary, unvalidated color-vision exam, and, ultimately, diagnosed with a color-vision deficiency that the company deemed incompatible with the conductor position. App. 5–6, R. Doc. 1, at 5–6; App. 89, R. Doc. 17-1, at 17.

29

Under *American Pipe*, Mr. DeGeer was entitled to rely on the filing of the *Harris* class action to toll the statute of limitations on his claim. The filing of *Harris* informed Union Pacific of the nature of the claim against it, and of the identities of the class members whose claims it had reason to expect—including Mr. DeGeer himself. *See Am. Pipe*, 414 U.S. at 551. Union Pacific was thus equipped with all the "essential information" it needed to defend itself against his claim. *Id.* at 555. And Mr. DeGeer, for his part, was entitled to rely on the filing of the class suit to preserve his claim, without any duty to "take note of the suit" or to "exercise any responsibility with respect to it." *Id.* at 552.

**2.** Throughout the *Harris* litigation, that didn't change. The class always included workers like Mr. DeGeer.

As an initial matter, that was true at all times between the filing of the complaint and the filing of the motion to certify the class. For instance, during discovery, Union Pacific objected to the potential scope of the plaintiffs' initial proposed class. *See* App. 54–55, R. Doc. 16 at 4–5; App. 173, R. Doc. 17-9, at 4; App. 193–94, R. Doc. 17-13, at 14–15. The company insisted that the plaintiffs narrow their proposed class definition—specifically, that they focus on workers who faced the fitness-for-duty process for reasons related to, or that resulted in some way from, the types of medical events or conditions the company viewed as "reportable health events." *See* App. 54–48, R. Doc. 16, at 4–8; App. 173, R. Doc. 17-9, at 4; App. 193–94,

R. Doc. 17-13, at 14–15; *see also* App. 199, R. Doc. 17-14, at 2. And when the plaintiffs asked Union Pacific to identify all of those workers who would "fall within" what the company saw as the appropriate class definition, the company responded with a list "identifying" the "current or former Union Pacific employees subject to a Fitness for Duty Evaluation related to a Reportable Health Event." App. 55–56, R. Doc. 16, at 5–6; App. 173–74, R. Doc. 17-9, at 4–5; App. 191, 193–94, R. Doc. 17-13, at 12, 14–15. Mr. DeGeer was included on both the second and third (and final) iterations of that list. App. 176, R. Doc. 10, at 83; App. 178, R. Doc. 17-12, at 29.

That the class included workers like Mr. DeGeer remained true when the plaintiffs moved for class certification. The plaintiffs' motion adopted the class definition that Union Pacific had proposed, treating Union Pacific's final "list of over 7,000 individuals"—the very list that included Mr. DeGeer—as "the list of class members." App. 207, R. Doc. 17-15, at 4; App. 139, R. Doc. 17-2, at 22. The declarations that the plaintiffs provided in support of their certification motion likewise included testimony from Mr. DeGeer himself, along with other workers like him. App. 60, R. Doc. 16, at 10; App. 158–168, R. Doc. 17-3, at 6–7, 45–46, 50–51, 86–87. Explicitly naming Mr. DeGeer, the plaintiffs explained that these workers met the class definition because they were among those to whom the fitness-for-duty policy was "applied in a discriminatory manner" as a result of "reportable health events." App. 133, 135, R. Doc. 17-2, at 16, 18. After all, one of the "conditions" that Union Pacific

treated as such a "reportable health event" was a "recent event" in "color vision" acuity—the very problem the Ishihara test was meant to detect. App. 114–15, R. Doc. 17-1 at 43–44.

The district court's order certifying the class likewise explicitly named Mr. DeGeer as a class member. The district court recognized that each of the 44 "class members" who submitted declarations had "experienced the discrimination alleged" by the now certified class—including those who, like Mr. DeGeer, were subject to a fitness-for-duty evaluation as a result of a failed Ishihara vision test during a recertification process. *Harris*, 329 F.R.D. at 624 & n.3; *see also* App. 158–168, R. Doc. 17-3, at 6–7, 45–46, 50–51, 86–87. And the court "approve[d]" the sending of notice to Union Pacific's entire 7,723-person "class list"—including Mr. DeGeer himself. *Harris*, 329 F.R.D. at 627-28. Union Pacific, too, recognized that the district court's certification order included these workers: It cited their declarations as "illustrat[ions]" of the workers in the class, and it argued on appeal that the class was overbroad precisely because of their inclusion. *See, e.g.*, App. 300, 311, 316–17, R. Doc. 17-20, at 19, 30, 35–36; App. 246, R. Doc. 17-19, at 1.

**3.** That makes this an easy case. As a member of the *Harris* class, Mr. DeGeer was entitled to *American Pipe* tolling from the moment he experienced the class-wide discrimination—since the class complaint had then already been filed—up until the moment the Eighth Circuit decertified the class. *See Crown, Cork*, 462 U.S. at 354 (1983)

(explaining that, "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied"); *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1147 (5th Cir. 1997) (explaining "the *American Pipe* rule applied to all potential class members"). He filed his EEOC complaint a little over a month after the Eighth Circuit decertified the class. App. 54, R. Doc. 16, at 4. And after the EEOC finished its investigation, Mr. DeGeer filed his federal complaint almost immediately—well within the 90 days the agency allowed. *Id.*; App. 15, R. Doc. 1, at 15. His claim was thus timely, and he should have been allowed to pursue it.

## II. The district court's contrary logic distorts *American Pipe* tolling beyond all recognition.

To bar Mr. DeGeer's claim, the district court set aside this lengthy history and the straightforward tolling principles that the Supreme Court announced in *American Pipe*. The district court did not point to anything that anyone in *Harris* had said or done to indicate an intent to exclude from the class everyone who, like Mr. DeGeer, was routed into the fitness-for-duty program for failing the Ishihara vision test during a routine recertification. Instead, it zeroed in on just one line in the entire *Harris* record: Mr. DeGeer's mention of the fact that he underwent a fitness-for-duty evaluation "as part of" a routine FRA recertification. Order at 11. That statement, the court decided, was on its own enough to place Mr. DeGeer outside the class definition that Union Pacific had insisted the plaintiffs adopt.

This was error twice over. *First*, it misapprehends the record. If the court had paid attention to what actually happened in *Harris*, it would have understood, as the parties and court in *Harris* did, that Mr. DeGeer was never excluded from the class, and his declaration doesn't say otherwise. *Second*, the district court was wrong to treat *American Pipe* tolling as turning not on the detailed history of the *Harris* litigation, but instead on a later court's own best guess of how the class definition might apply to individual plaintiffs. The "*American Pipe* rule" does not "vary based on the individual equities invoked by each former, putative class member." *Barryman-Turner v. District of Columbia*, 115 F. Supp. 3d 126, 133 (D.D.C. 2016). Rather, it turns on whether a given *defendant* had adequate notice of the basic nature of the claims against it. *See Hall*, 727 F.3d at 378. An acknowledged class member's general description of his history cannot somehow rob a defendant of the notice that the initial filing of the class supplied. The interests *American Pipe* safeguards are thus not served by the district court's approach to tolling, and Mr. DeGeer's claims should have been deemed timely here.

**A.** Begin with the district court's flawed understanding of Mr. DeGeer's declaration. The court appears to have concluded that, insofar as Mr. DeGeer's underwent a fitness-for-duty evaluation as part of his routine FRA recertification, he was incapable of undergoing such an evaluation as a "result of a reportable event" within the meaning of the class definition.

There are multiple problems with this theory. First, the declaration says nothing of the sort. The fact that Mr. DeGeer "under[went] a fitness-for-duty evaluation as part of [his] routine FRA recertification" does not somehow prevent that evaluation from being the result of a reportable health event. As Union Pacific itself has explained, a reportable health event that triggers the company's fitness-for-duty evaluation could be "discover[e]d" "during [a] required regulatory examination . . . such as an FRA examination." App. 121, R. Doc. 17-2, at 4; *see also Harris*, 329 F.R.D. at 620. And that is precisely what Mr. DeGeer alleged happened here: His failure of the Ishihara test indicated a possible vision deficiency, amounting to a reportable health event that in turn "trigger[ed] a Fitness-for-Duty evaluation," this time using the Light Cannon test. App. 4, 6, R. Doc. 1, at 4, 6.

The district court seems to have concluded otherwise by mixing up the basics of causation. The FRA re-certification may have triggered the failed Ishihara test, but that failed Ishihara test was what in turn triggered Mr. DeGeer's fitness-for-duty evaluation using the Light Cannon test. Had Mr. DeGeer passed the Ishihara test, he would not have been directed to take the Light Cannon test. So, while the FRA re-certification may have been a but-for cause of his fitness-for-duty evaluation, it was the failure of the Ishihara test that was its proximate cause. Mr. DeGeer's fitness-for-duty evaluation was, therefore, a "result of" the failure of his Ishihara test within the meaning of the *Harris* class definition.

Second, the court erred by ignoring what Mr. DeGeer's declaration actually was—a declaration filed *by a putative class member* in support of class certification. That's how everyone in *Harris* understood it: Based on both the declaration and the class lists on which Mr. DeGeer appeared, they explicitly recognized Mr. DeGeer as a member of the class. *See Harris*, 329 F.R.D. at 627–28 (certifying a class that included the full "class list" of 7,723 class members Union Pacific had prepared, and which included Mr. DeGeer); *id.* at 624 n.3 (referencing Mr. DeGeer by name); App. 135, R. Doc. 17-2, at 18 (same); App. 205, R. Doc. 17-15, at 2 (plaintiffs relying on that same list in moving for certification); App. 246, R. Doc. 17-19, at 1 (Union Pacific agreeing that the certified class included that same group of "more than 7,000 current and former Union Pacific employees"). Union Pacific even explicitly premised several of its arguments for decertification on the inclusion of workers like Mr. DeGeer in the class. App. 282–85, 306–08, R. Doc. 17-20, at 1–4, 25–27; App. 246, 261, R. Doc. 17-19, at 1, 16. It was only after Union Pacific successfully employed these arguments to win decertification that it changed its tune.

Nor did the company ever once suggest, even as it urged the plaintiffs to adopt a narrower class definition, that doing so would exclude people like Mr. DeGeer. Just the opposite. When Union Pacific insisted that the plaintiffs in *Harris* narrow their proposed definition, it told them that its objective was simply to capture "the factual allegations pled and the Named Plaintiffs' claims," App. 200, R. Doc. 17-14,

at 2, and to prevent the class from becoming unworkably overbroad, App. 193–94, R. Doc. 17-13 at 14–15.

That shouldn't be surprising. Not only did Mr. DeGeer's experience match the basic parameters of the class definition, as we've explained, *see supra* at 28–29, but the parties in *Harris* did not understand that definition as establishing the strict causal relationship the district court here appeared to apply. To the contrary, when Union Pacific argued for that definition, it treated causal language ("evaluations that were initiated *because of* a Reportable Health Event") as the equivalent of looser constructions ("evaluations *related to* Reportable Health Events"). *See* App. 199–201, R. Doc. 17-14, at 2–4.

**B.** There is an even more fundamental problem with the district court's theory. The district court was wrong to ground Mr. DeGeer's entitlement to *American Pipe* tolling on its own view about how to best apply the *Harris* class definition to Mr. DeGeer's declaration. The availability of *American Pipe* tolling has never turned on the decision of a new court—one that was a stranger to the initial class proceedings— to pick apart a class definition and conclude that, under some technical, heretofore unexamined nuance, a particular plaintiff wasn't included.

Here, the court that *was* charged with determining who was in the class when *American Pipe* tolling began explicitly found that the experience Mr. DeGeer described in his declaration made him part of the class. The *Harris* district court held that each

37

of the declarants had "experienced the discrimination alleged" by the now certified class. *Harris*, 329 F.R.D. at 624. And it cited Mr. DeGeer's declaration by name as one of the declarants the court viewed as a "class member[]" based on the declaration they submitted. *Id.* & n.3. Indeed, the *Harris* court's determination that Mr. DeGeer and the other declarants were class members was key to its class certification ruling. The court's conclusion that the named plaintiffs satisfied Rule 23(a)'s adequacy requirement was explicitly premised on a comparison between the named plaintiffs and "the 44 class members" who had submitted declarations. *See Harris*, 329 F.R.D. at 624. It was precisely *because* the named plaintiffs and the declarants' interests were aligned, and thus that the named plaintiffs could adequately represent "the putative class members," that the court was willing to certify the class.

The district court here gave no reason why, under the *American Pipe* doctrine, its view on who was part of the class should overrule the *Harris* court's determination. In fact, *American Pipe* demands exactly the opposite: Its tolling rule applies to "all those who *might* subsequently participate in the suit." *Am. Pipe*, 414 U.S. at 551 (emphasis added). Expressly anticipating that there could be some ambiguity in the outer contours of a given class, the Supreme Court in *American Pipe* chose not to base the availability of its tolling rule on the equities of a particular plaintiff's case. *Barryman-Turner*, 115 F. Supp. 3d at 133. Instead, it chose to establish a "bright-line rule": The

38

statute of limitations "'remains tolled for all members of the putative class *until class certification is denied*' for whatever reason." *Bridges*, 441 F.3d at 212 (quoting *Crown, Cork*, 462 U.S. at 354). The resulting doctrine is an equitable one, and it recognizes that the objectives of limitations periods, and of Rule 23, are best served by tolling a limitations period for putative class members until and unless it is abundantly clear that they are not a part of the class. *Am. Pipe*, 414 U.S. at 551-55. *Cf. Hall*, 727 F.3d at 377 (noting that those courts holding that *American Pipe* tolling ceased did so only because "the putative class members *had no reason* to assume that their rights were being protected" (emphasis added)).

**C.** The district court's reasoning also unavoidably conflicts with the core objectives of the doctrine. Consider what the district court's approach would demand of people like Mr. DeGeer. Despite having submitted a declaration in support of class certification, and despite the fact that the plaintiffs *and* the district court *explicitly* named him as a class member, he was supposed to figure out that his unique circumstances—or even simply the way he happened to express them in his declaration—in fact excluded him from the class. And in doing so, he was supposed to disregard the fact that he personally appeared on the proposed class list, along with others like him; that he, and others like him, were repeatedly described in *Harris* as experiencing the very discrimination the class was supposed to capture; and that

39

the inclusion of these sorts of workers in the class was one of the reasons why it was supposedly overbroad.

*American Pipe* has never required putative class members to anticipate these sorts of contingencies. To the contrary, as the Supreme Court observed nearly fifty years ago: Class members have no "duty to take note of" a pending class suit "or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case." *Am. Pipe*, 414 U.S. at 552. A putative member of the original class who is repeatedly informed of that status therefore certainly has no duty to question whether he is in fact a member.

To nevertheless deprive someone who had every reason to think he was a class member of *American Pipe* tolling would turn that doctrine on its head. At best, it would invite inefficiency, encouraging class members who are uncertain as to their class status to undertake the very "unnecessary filing of [protective] repetitious papers and motions" that *American Pipe* tolling was intended "to avoid." 414 U.S. at 550. *See Lloyd's Leasing Ltd. v. Bates*, 902 F.2d 368, 371 (5th Cir. 1990) ("The [*American Pipe*] Court did not want parties filing suits and motions to intervene in order to escape the danger of the statute of limitations when a decision as to the viability of the class action was pending because such activities would destroy the efficacy of the class action."). And at worst, it would allow defendants to spring traps for unwary class members by misleading plaintiffs, courts, and the class about the effect of changes to a proposed

class until it is too late to correct the mistake. *American Pipe* tolling exists to prevent exactly this sort of confusion, and it should have been applied here.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
LINNET R. DAVIS-STERMITZ
Gupta Wessler LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
Gupta Wessler LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

JAMES H. KASTER
LUCAS J. KASTER
Nichols Kaster, PLLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 256-3200

September 21, 2023

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,513 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font. This brief and the corresponding addendum comply with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

September 21, 2023

_/s/ Matthew W.H. Wessler_
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.


*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler